

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 4, 2025

**BY ECF**

The Honorable Margaret M. Garnett
Thurgood Marshall United States Courthouse
40 Foley Square
New York NY 10007

> **Re:**  *United States v. Changli Luo, a/k/a Sophia Luo*, **25 Cr. 412** **(MMG)**

Dear Judge Garnett:

The Government respectfully submits this letter to oppose the defense's letter dated November 21, 2025, requesting that the Court modify the conditions of the defendant's pre-trial release (the "Motion") to remove the condition of home detention and replace that condition with a curfew.  For the reasons set forth below, the Court should deny the Motion.

## BACKGROUND

### I.       Offense Conduct

In or about November 2022, the defendant and an individual ("Victim-1") met in person after the defendant contacted Victim-1 via LinkedIn.  After a handful of in-person meetings, the defendant and Victim-1 had an intimate sexual encounter in or about June 2023 (the "Sexual Encounter").  On or about June 29, 2023, the defendant sent Victim-1 a long-form letter via iMessage (the "June 29th Letter").  In the June 29th Letter, the defendant repeatedly professed her love for Victim-1, writing, for example, "I never told you I love you, and tonight I want to tell you that, I have been restraining my feeling for you, as I do love you from the bottom of my heart!"  When the defendant sent Victim-1 the June 29th Letter, the defendant and Victim-1 had met in person three times.  Victim-1 did not respond to the June 29th Letter.  On or about November 4, 2023, the defendant sent Victim-1 a text message.  Victim-1 did not respond to this message.  The defendant's communications to and conduct toward Victim-1—and members of his family— then turned from flattering to threatening.

On or about November 30, 2023, the defendant used a fake name to gain access to the workplace of Victim-1's then-girlfriend and now-wife.  Once inside Victim-1's wife's workplace, the defendant told Victim-1's wife, among other things, that: (i) the defendant and Victim-1 had sex; (ii) Victim-1 had impregnated the defendant and forced the defendant to have an abortion; (iii) Victim-1 was a terrible and horrible person; and (iv) Victim-1 was like Jeffrey Epstein.  Since January 2025, the defendant has specifically targeted Victim-1's wife as an individual whom she also seeks to hurt.

On or about May 9, 2024, Victim-1's ex-wife (the "Ex-Wife") received approximately three phone calls from a phone number ending in 9268 (the "9268 Number"), which she did not recognize.[1]  The Ex-Wife ignored the first two calls but answered the third.  The caller did not identify herself, but asked whether the Ex-Wife was Victim-1's wife.  When the Ex-Wife explained that she and Victim-1 had divorced, the caller told the Ex-Wife that Victim-1 had sexually assaulted her and that the Ex-Wife should protect her children.  The caller used the name of one of Victim-1 and the Ex-Wife's children during the phone call.

In or about May 2024, the defendant sent two letters to Victim-1 via iMessage, accusing Victim-1 of, among other things, having "misled" the defendant in order to have sex with her, and, in the alternative, having sex with the defendant while she was mentally incapacitated or mentally disabled.  The defendant stated in these letters that her "home has cameras," and that "[e]verything [Victim-1] did was caught on camera."  The defendant wrote, "I have the right to inform your family, friends, and current and future business partners about your behaviors . . . I have the right to accept interviews from a variety of media and publications that I have already contacted.  I am sure your family and business partners will learn about you and your misdeeds from these interviews and will provide exposure that will taint your record forever."  The defendant stated that she would expose to "mass media" what was purportedly captured on these cameras if Victim-1 did not apologize.  In the second letter, the defendant wrote, "anyone, whoever they are, who violates" laws such as "sex crime," "bribery," and other crimes, "will eventually face judgment," and then provided Victim-1 with the information for a certified mediator.  In or about June 2024, Victim-1 agreed to enter into mediation with the defendant.  Though Victim-1 denies the defendant's allegations, Victim-1 believed that mediation would avoid harassment of Victim-1's family and potential public embarrassment.  Victim-1 entered into a settlement agreement with the defendant in which Victim-1 agreed to pay the defendant a sum of money.  Victim-1 made an initial payment to the defendant as agreed.

In or about January 2025, despite the settlement agreement into which Victim-1 and the defendant had entered, the defendant conveyed to Victim-1 through the mediator a list of demands and threats, on the alleged basis that Victim-1 had transmitted a sexually transmittable infection ("STI") to her.  In substance and in part, the defendant demanded that Victim-1 pay her hundreds of millions of dollars, and at one point as much as $1.215 billion dollars, or else she threatened she would, among other things, report criminal acts to "government offices," including a federal agency related to one of Victim-1's businesses.  At several points in January 2025, the defendant asked the mediator to convey to Victim-1's counsel that the defendant wanted to inflict "as much damage as possible" on Victim-1, and that her focus was shifting to "destroying" Victim-1.

On or about March 25, 2025, the defendant filed a whistleblower complaint with the U.S. Department of Justice Criminal Division requesting an investigation into Victim-1 and one of Victim-1's companies, claiming, among other things, bribery and fraud.

---

[1] Call detail records associated with the 9268 Number show that the 9268 Number is subscribed to in the defendant's name and reflect three phone calls from this number to the Ex-Wife on May 9, 2024.

On or about April 1, 2025, an attorney representing Victim-1 emailed an attorney representing the defendant to confirm that the contents of the email "reflect[ed] what [the defendant] directed [the defendant's attorney] to communicate through [Victim-1's attorney] to Victim-1." The email from Victim-1's attorney contained the following, in substance and in part: (i) the defendant's monetary demand changed to $50 million; (ii) if Victim-1 does not take "responsibility," the defendant is determined to "destroy" Victim-1; (iii) the defendant had multiple cameras in the apartment where the Sexual Encounter occurred and the defendant has at least two videos and pictures of the Sexual Encounter, which she will provide to others absent a resolution; and  (iv) absent resolution, the defendant was prepared to report the defendant's allegations to "criminal investigators," Victim-1's business partners and "the federal government." Later the same day, the defendant's attorney confirmed that the contents of the email were correct and further explained that the defendant instructed the defendant's attorney to convey this message to Victim-1 through counsel on March 29, 2025. Victim-1 did not pay the $50 million the defendant demanded.

On or about April 5, 2025, an individual who provided the name "Sophia L," submitted an online tip regarding Victim-1 to the FBI. In this tip, "Sophia L" claimed that Victim-1 had bribed government officials. "Sophia L" submitted her tip using a Gmail account (the "Gmail Account") with an associated Google Pay account subscribed to in the name of "Changli Luo"—that is, in the name of the defendant.

On or about May 27, 2025, the Honorable Robyn F. Tarnofsky, United States Magistrate Judge for the Southern District of New York, authorized search warrants for the defendant's premises and person. The law enforcement search team executed these warrants on or about May 29, 2025. The defendant attempted to obstruct the execution of the warrants. Specifically, for example, FBI special agents called the defendant's cellphone 15 times, texted that the FBI was outside of her residence, and knocked and announced their presence outside of her residence for the purpose of conducting a search. The defendant did not respond to any of the phone calls, the text, or the knocks; however, individuals who lived in the apartments near the defendant's residence exited their buildings to see what was happening. After about 20 minutes, the search team gained access to the defendant's apartment using a key that they obtained from the building's superintendent. When the search team entered the defendant's apartment, the defendant was standing in the hallway between her bedroom and the living room. After conducting a manual search of the defendant and the defendant's residence, the FBI agents deployed a canine who had been trained to detect electronic devices. The canine alerted on a package of sanitary pads in the defendant's bathroom. After the canine alerted, the agents searched the bathroom again and found a cellphone and two thumb drives hidden in a package of sanitary pads. In addition, the agents found another cellphone stashed underneath a mountain of dirty clothes in a hamper in the same bathroom. During the search, FBI agents seized approximately 18 electronic devices, consisting of, among other devices, three cellphones, two computers, and eight RAM, thumb, hard, flash, or solid-state drives.

After the search, law enforcement officers reviewed the devices seized from the defendant's person and residence pursuant to the judicially-authorized search warrants.

A.  The Rose Gold Cellphone

Law enforcement's review of a rose gold iPhone (the "Rose Gold Cellphone") seized from the defendant's person during the execution of the search warrants revealed that the defendant had downloaded at least two photo and video editing applications on the device. On March 28, 2025—that is, a few days before the defendant's lawyer conveyed to the lawyer for Victim-1 that the defendant had videos and photos of the Sexual Encounter—from approximately 12:41 p.m. to approximately 10:50 p.m., the defendant saved a number of pornographic videos and took screenshots of these videos. Log entries on the Rose Gold Cellphone show that the defendant used one of the video and picture editing applications on March 28 between approximately 12:38 and 12:41 p.m. Later on March 28, 2025, at approximately 10:54 p.m., the defendant took a screenshot of a publicly available photo of Victim-1. A few hours later, at approximately 1:16 a.m. on March 29, 2025, the defendant took a screenshot of one of the pornographic images she had previously screenshotted with a photo of Victim-1 superimposed on top.

The review of the Rose Gold Cellphone also revealed that the defendant searched, among other things, on March 1, 2025, "how much money does a person need in China to be considered rich,"[2] "Brandon Thompson SDNY" on April 5, 2025, and "bill cosby extortion" on April 8, 2025. On April 8, 2025, the defendant deleted nearly all of the pornographic videos and screenshots she had taken of the pornographic videos, the publicly available photo of Victim-1 that she had screenshotted, as well as the fake pornographic image she made of Victim-1. The Rose Gold Cellphone also reflected the 15 calls and texts that the FBI agents placed to the defendant's phone as they tried to gain entry to execute the search warrants. In addition, the call history on the Rose Gold Cellphone indicated that the defendant had placed outgoing calls during the time period in which law enforcement had placed the 15 calls to her. Finally, the Gmail Account that "Sophie L" had used to submit an online tip to the FBI regarding Victim-1 was listed as a "user Account" on the Rose Gold Cellphone.

B.  The Purple Cellphone

Law enforcement's review of an iPhone in a purple case (the "Purple Cellphone") found in the defendant's bathroom revealed that the defendant had downloaded at least two photo and video editing applications onto the Purple Cellphone. On March 28, 2025, at approximately 4:34 p.m., the defendant took a screenshot of a publicly available photo of Victim-1. On March 29, 2025, between approximately 9:50 a.m. and 10:00 a.m., the defendant took screenshots of pornographic images—the same images that were on the Rose Gold Cellphone. Hours later on March 29, 2025, the defendant took a screenshot using the Purple Cellphone of a fake pornographic photo with the Victim-1's face superimposed; the fake pornographic image that the defendant screenshotted using the Purple Cellphone was also on the Rose Gold Cellphone. On April 4, 2025, the defendant also screenshotted a second fake pornographic image that depicted Victim-1's face.

On or about June 14, 2025—that is, approximately 16 days after law enforcement searched the defendant and her premises—the defendant attempted to board a flight to China with a one-

---

[2] This search was conducted in Chinese but translated with machine translation.

way ticket.  Law enforcement agents arrested the defendant at John F. Kennedy airport moments before the defendant's flight was set to depart.

## II.      Procedural History

On or about June 14, 2025, the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, authorized a complaint charging the defendant with one count of destruction, alteration, or falsification of records in federal investigations, in violation of Title 18, United States Code, Section 1519 and one count of blackmail in violation of Title 18, United States Code, Section 873 and 2.  The defendant was presented before Judge Netburn on Saturday, June 14, 2025.  After listening to argument from the defense and the Government, Judge Netburn ordered the defendant detained until Monday, June 16, 2025, on which date she ordered the following conditions of release to be imposed:  (i) a $500,000 personal recognizance bond to be co-signed by one financially responsible person and secured by $100,000 in cash or property; (ii) travel restriction to the Southern and Eastern Districts of New York; (iii) surrender of passport and other travel documents, and a bar on applying for new travel documents; (iv) pretrial supervision as directed by the Office of Pretrial Services in the Southern District of New York ("Pretrial Services"); (v) mental health evaluation and treatment as directed by Pretrial Services; (vi) defendant precluded from possessing firearms, destructive devices, or other weapons; (vii) defendant precluded from using the WeChat application; (viii) defendant precluded from relocating without the permission of Pretrial Services; (ix) defendant precluded from contacting, directly or indirectly, witnesses or victims, including Victim-1, and representatives or family members of Victim-1 outside the presence of counsel; and (x) home detention, enforced by GPS monitoring.[3]  *See* ECF No. 2.

On or about September 11, 2025, a grand jury sitting in this District returned a four-count indictment charging the defendant with one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, one count of Hobbs Act extortion in violation of Title 18, United States Code, Sections 1591 and 2, one count of blackmail, in violation of Title 18, United States Code, Sections 873 and 2, and one count of destruction and concealment of records in federal investigation, in violation of Title 18, United States Code, Sections 1519 and 2.

On November 21, 2025, the defense filed the Motion requesting that the Court modify the conditions of the defendant's release.  Specifically, in the Motion, the defense asks the Court to downgrade the conditions of the defendant's release to a curfew, while maintaining the GPS monitoring condition, which is already in place, based on purported "changed circumstances."  *See* ECF No. 24.

---

[3] Based on conversations with the defendant's Pretrial Services officer, the Government understands that the current conditions of the defendant's pretrial release allow the defendant to leave her apartment for a host of reasons, such as, for example to work, to attend doctor's appointments, or to obtain groceries, provided that the defendant first obtains permission from Pretrial Services.

### III.    Applicable Law

A determination of bail conditions "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." Title 18, United States Code, Section 3142(f)(2)(B); *see also United States v. Rodriguez*, No. 15 MJ 02956 (JGK), 2015 WL 6503861, at *1 (S.D.N.Y. Oct. 26, 2015) ("[T]he hearing can be reopened if the court finds that information exists that was not known to the defendant at the time of the hearing and that has a material bearing on the issue that was decided."). However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." *United States v. Lewis*, No. 16 Cr. 0212, 2016 WL 6902198 (LAK), at *2 (S.D.N.Y. Nov. 16, 2016) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)).

## **ARGUMENT**

### IV.    The Defense Has Not Satisfied the Threshold Showing Required to Reopen the Bail Hearing

The Court should deny the Motion because the defense has not satisfied the threshold showing required for the Court to reopen the bail hearing:  that information exists that "was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  Title 18, United States Code, Section 3142(f).  In the Motion, the defense asks the Court to modify the conditions of the defendant's pretrial release "based on changed circumstances."  Motion at 1.  However, the defense cites no such changed circumstances.  The defense writes, "[f]or the last six months, (since June 16, 2025), Ms. Luo has been fully compliant with all directives issued by the Court and Pre-Trial Services. She has strictly adhered to the home detention restrictions and has consistently cooperated with supervision."  Motion at 1.  The law is clear, however, that compliance with existing conditions of release does not constitute new information such that the Court may reopen the bail hearing.  *See United States v. Esposito*, 354 F. Supp.3d 354, 361 (S.D.N.Y. 2019) (denying defendant's motion for reconsideration of the conditions of his pretrial release because "the Court [found] that Esposito's record of compliance with the conditions of his pretrial release does not constitute new information" under Title 18, United States Code, Section 3142(f)(2)(B)); *see also, e.g.*, *United States v. Chambers*, 23-20009-DDC, 2023 WL 8254523, at *2 (D. Kan. Nov. 29, 2023) ("Here, the only 'new information' that Chambers arguably identifies is that he 'has been on bond in this case without violation since February 10, 2023 . . . . [T]he court agrees with the persuasive reasoning of other courts that a defendant's compliance with conditions of pretrial release is not new material sufficient to reopen a detention hearing or allow a court to proceed to the merits of a petition to modify conditions of pretrial release."); *United States v. Gay*, 4:20-cr-40026-JS-JEH, 2020 WL 5983880, at *3 (C.D. Ill. Oct. 7, 2020) (same); *United States v. Johnson*, 2:21-cr-00707-WJM, 2022 WL 375319, at *2 (D.N.J. Feb. 8, 2022) ("Defendant has failed to provide evidence of changed circumstances that warrant modification of the conditions of his release.  First, Defendant's record of compliance with such conditions does not warrant modification thereof . . .

Defendant has not cited, nor has the Court found, any authority or the proposition that mere compliance with current or past conditions of pretrial release constitute the necessary changed circumstances to warrant bail modification."); *United States v. Ebonka*, 733 F. Supp. 3d 967, 969–70 (D. Nev. 2024) ("It is presumed that the defendant will abide by the conditions imposed and his demonstrated ability to do so is what allows him to remain on pretrial release.  The fact that Defendant has complied with his conditions of release is what allows him to remain out of custody and is not new information that has a material bearing on his conditions to reopen the detention hearing."); *United States v. Kube*, 1:19-cr-00257-SKO, 2020 WL 1984178, at *5 (E.D. Cal. Apr. 27, 2020) (same).

Because the defense has failed to offer new information, it has failed to satisfy the statutory requirements to reopen the bail hearing and request that the Court modify the conditions of the defendant's pretrial release.  In cases where defendants have failed to proffer new information to support requested changes to conditions of pretrial release under Section 3142(f)(2)(B), courts have denied the motions. *See, e.g.*, *Esposito*, 354 F. Supp. 3d at 361; *United States v. Banks*, 334 F. Supp. 3d 589, 590 (S.D.N.Y. 2018); *see also, e.g.*, *United States v. Zhang*, 22-cr-208-4 (CBA), 2022 WL 17420740, at *1 (E.D.N.Y. Aug. 2, 2022); *United States v. Rivera*, 2010 WL 1687069, at *3 (E.D.N.Y. 2010).  The Court should do the same here.

### V.    The Current Conditions of Release are the Least Restrictive Set of Conditions that Reasonably Assure the Defendant's Appearance and the Safety of Any Other Person In The Community

#### A. *The Defendant Poses a Significant Risk of Flight*

The defendant presents a significant risk of flight for at least four reasons.  First, as described above, the defendant has already taken steps to impede law enforcement investigation into her conduct.  On April 5, 2025, before the execution of the search warrants in May, the defendant Googled the name of one of the Assistant United States Attorneys handling this case, suggesting that she was aware that federal law enforcement had been investigating her as early as that date.  On the morning that law enforcement attempted to execute the search warrants, the defendant refused to answer the 15 calls that special agents placed to her despite using the same device to place outgoing calls at the same time.  While law enforcement was attempting to enter the defendant's residence to execute judicially-authorized search warrants, she hid electronic devices that contained inculpatory evidence. This conduct, which demonstrates both a consciousness of guilt and intentional efforts to frustrate a federal investigation, suggests that she will flee instead of remaining in the District to face prosecution.

Second, the defendant's conduct has already demonstrated that the risk of flight in this case is real and not conjecture.  Approximately two weeks after law enforcement executed the search warrants—and before she had been charged with any crimes—the defendant booked a one-way ticket to China.  Law enforcement arrested the defendant at the airport moments before she was supposed to board her flight.  In addition, on or about March 1, 2025, the defendant searched, "how much money does a person need in China to be considered rich?"

Third, the defendant has access to vast resources and an extensive network overseas. The defendant was born in China. Based on a review of the defendant's devices, the Government understands that the defendant's parents, as well as multiple siblings, live in China. In addition, based on the Government's review of the defendant's devices, the Government understands that the defendant owns and/or has investments in multiple real estate properties in China. The defendant also has substantial liquid assets in China. A review of several U.S.-based bank accounts held in the defendant's name shows that between on or about December 30, 2021, and on or about January 17, 2025, the defendant wired approximately $1,024,526.00 to Chinese bank accounts.[4] In addition, on or about June 9, 2025—that is, after law enforcement executed the search warrants and approximately five days before her arrest while trying to board a one-way flight to China, the defendant wired $710,000 from a U.S.-based bank account held in her name to a Hong-Kong based bank account held in the name of an individual whose surname is also Luo.

Fourth, the defendant faces significant penalties and strong inculpatory evidence. The statutory maximum for two of the offenses charged in the indictment is twenty years; these penalties create an incentive for the defendant to flee. *See, e.g.*, *United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011) (affirming district court's denial of bail, which based, in part, on the fact that "a 20-year mandatory minimum sentence . . . overcomes virtually any tie to the community and gives [the defendant an extraordinary incentive to flee."). In addition, the Government has already proffered significant and powerful evidence of the defendant's guilt, which is plainly relevant to a defendant's risk of flight. *See, e.g.*, *United States v. Zarrab*, 15 Cr. 867 (RMB) 2016 WL 3681423, at *2 (S.D.N.Y., June 16, 2016) (in evaluating risk of flight the court is to consider, among other factors, "the weight of the evidence against the suspect") (internal citation omitted). The defendant has every incentive to flee to another country where she has financial resources, family ties, and property instead of remaining in the United States to be prosecuted and perhaps imprisoned. These risk factors persist even under the defendant's current conditions of pretrial release. A GPS monitor—a condition to which the defendant is currently subject—is a meaningful, but imperfect, deterrent. *See, e.g.*, *United States v. Kwok*, 23 Cr. 118 (AT) 2023 WL 3027440, at *7 (S.D.N.Y., Apr. 20, 2023) ("[A]nkle monitors can be removed and ensure only a reduced head start should a defendant decide to flee."). Any set of conditions less restrictive than those currently in place is inadequate to reasonably assure the defendant's appearance at future court proceedings as the Bail Reform Act requires.

### B. The Defendant Poses a Danger to Victim-1 and Members of Victim-1's Family

The Court should deny the Motion because the defendant poses a danger to the community. The defendant has already engaged in threatening and harassing behavior toward Victim-1 as well as Victim-1's family. As set forth above, the defendant adopted a fake identity to harass Victim-1's wife at her place of work. The defendant placed repeated calls to Victim-1's Ex-Wife. The defendant has used the names of Victim-1's children. In conveying the demand for $50 million to Victim-1's counsel, previous counsel for the defendant conveyed to Victim-1's counsel that she intended to "destroy" Victim-1 and that "he will feel all the pain coming his way." In addition,

---

[4] Approximately $217,900.02 was wired from Chinese accounts back to U.S.-based accounts held in the defendant's name, resulting in a net of $806.625.98 wired by the defendant to Chinese bank accounts.

the defendant's reluctance to sign the protective order based on the defendant's self-proclaimed "compelling interest in speaking publicly" suggests that she desires to inappropriately try this case in the press, thereby imperiling the privacy interests and safety of Victim-1 as well as members of Victim-1's family, as she has repeatedly threatened. ECF No. 18 at 4.

## CONCLUSION

The Court should deny the Motion. A defendant's compliance with existing conditions of release is not a basis to lessen them; it merely indicates that the existing conditions are working as intended. The defendant continues to pose a significant risk of flight as well as a danger to the community. The fact that the defendant does not want to be bound by the existing conditions does not change that those conditions are necessary.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _Brandon C. Thompson_
Brandon C. Thompson
Ni Qian
Assistant United States Attorneys
(212) 637-2444/2364