```
                 UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
----------------------------:

UNITED STATES OF AMERICA,    : Docket No.: 25-cr-00412

               Plaintiff,    :

          v.                 :

CHANGLI LUO,                 : New York, New York

                             : December 3, 2025

               Defendant.    :

----------------------------:

                    PROCEEDINGS BEFORE
               THE HONORABLE SARAH NETBURN
              UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF NEW YORK
                    BY:  BRENDAN THOMPSON, ESQ.
                    1 St. Andrew's Plaza
                    New York, New York 10007

For Defendant:      THE LAW OFFICE OF JEFFREY CHABROWE
                    BY:  LEE KOCH, ESQ.
                    521 5th Avenue, Suite 1729
                    New York, New York 10175


Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

THE DEPUTY CLERK:  Good afternoon, Your Honor.  This is the matter of the United States versus Luo.

Starting with the government, please state your name for the record.

MR. THOMPSON:  Good afternoon, Your Honor. Brandon Thompson for the United States.  And to my left is FBI Special Agent Lisa Scaglione.

THE COURT:  Thank you.  Good afternoon.

Yes, defense counsel.

MR. KOCH:  Good afternoon, Your Honor.  My name is Lee Koch, L-E-E; last name Koch, K-O-C-H. I'm appearing on behalf of the attorney of record, Mr. Jeffrey Chabrowe.  That's C-H-A-B-R-O-W --

THE COURT:  Sorry, you're going way too quickly for me.  If you could just speak more slowly, please.

MR. KOCH:  Oh, apologies, Your Honor.  It's so hot in here.  C-H-A-B-R-O-W-E.  Appearing for Ms. Luo.

THE COURT:  Thank you.

And it's pronounced Luo?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Good afternoon, Ms. Luo.

THE DEFENDANT:  Good afternoon, Judge.

THE COURT:  You can be seated.  Thank you.

Can I have the date and time of the defendant's arrest?

MR. THOMPSON:  Yes, Your Honor.  Today, June 14th, 2025, at 1:02 a.m.

THE COURT:  Thank you.

Ms. Luo, the purpose of today's proceeding -- you may be seated.  Thank you.

THE DEFENDANT:  Thank you.

THE COURT:  The purpose of today's proceeding is to advise you of certain rights that you have, inform you of the charges against you, consider whether counsel shall be appointed for you, and decide under what conditions, if any, you shall be released.  I'm now going to explain certain constitutional rights that you have.

THE DEFENDANT:  Okay.

THE COURT:  You have the right to remain silent.  You are not required to make any statements.  Even if you have already made statements to the authorities, you need not make any further statements.  Any statements that you do make can be used against you.

You have the right to be released, either conditionally or unconditionally, pending trial,

unless I find that there are no conditions that would reasonably assure your presence in court or the safety of the community.

You have the right to be represented by an attorney during all court proceedings, including this one, and during all questioning by the authorities.

I understand that you've retained counsel. If at any point in time you should run out of money, you can petition the Court to have counsel appointed at the government's expense and at no cost to you.

THE DEFENDANT:  Thank you.

THE COURT:  Ms. Luo, you've been charged in a two-count complaint.  Count one charges you with the destruction, alteration, or falsification of records in a federal investigation.  That count is brought under Title 18 of the United States Code, Section 1519.  And count two charges you with blackmail.  That count is brought under Title 18 of the United States Code, Section 873 and 2.

Counsel, have you received a copy of the complaint?

MR. KOCH:  I have, Your Honor.

THE COURT:  And have you had an opportunity to review it and discuss it with your client?

MR. KOCH:  I have not had a chance to review it.  My client, she was just brought out.  But, if you'll give me just a few minutes, it might be -- that's all I need, if that's okay.

THE COURT:  Sure.

MR. KOCH:  Thank you, Your Honor.

THE COURT:  All right.  We'll take a couple-minute recess.

(Recess.)

MR. KOCH:  Okay.

THE COURT:  You're welcome.  In the future, it'd be helpful if you just took all the time you needed before we got started so that we don't have to take a recess in the middle.

MR. KOCH:  I understand, Your Honor.

THE COURT:  But I'm happy to give you and your client enough time to discuss.

All right.  I'll pick up where I left off.

Have you received a copy of the complaint?

MR. KOCH:  Yes, Your Honor.

THE COURT:  And have you now had some time to discuss it with your client?

MR. KOCH:  Yes, Your Honor.

THE COURT:  Okay.  And she understands the nature of the charges?

MR. KOCH:  Yes, Your Honor.

THE COURT:  And does she waive any further public reading?

MR. KOCH:  Yes, Your Honor.

THE COURT:  Thank you.

Ms. Luo, you have the right to a preliminary hearing at which the government will have the burden of establishing that there is probable cause to believe that the crime for which you are being charged has been committed and that you committed it.  If you are in custody, you have the right to have this preliminary hearing within 14 days.  If you are not in custody, you have the right to have this preliminary hearing within 21 days.

A preliminary hearing will not, however, be held if, before the date it is scheduled, you are indicted by a grand jury or an information is filed against you by the government.  And I'll set a date for the preliminary hearing at the conclusion of these proceedings.

What is the government's position with respect to detention or release?

MR. THOMPSON:  Your Honor, the government's position is that there are a set of conditions that can reasonably assure the safety of the community

and the defendant's continued appearance.  The government and the defense are largely in agreement on those conditions.  Many of those conditions adopt those suggested by Pretrial.

I'm going to list them, if it's okay with Your Honor, and then flag two points that I think the parties disagree on.

THE COURT:  Okay.

MR. THOMPSON:  So, first, home incarceration as enforced by GPS electronic monitoring.

THE COURT:  Can I stop you for one second?

MR. THOMPSON:  Yes, Your Honor.

THE COURT:  Just to make sure you know, when you say "home incarceration," that that is different than home detention.

MR. THOMPSON:  Yes, Judge.

THE COURT:  Okay.  All right.

MR. THOMPSON:  A $500,000 bond secured by 100,000 in cash and one cosigner.

THE COURT:  I'm sorry.  I was writing something down.

So the bond amount you're proposing is?

MR. THOMPSON:  $500,000.

THE COURT:  Okay.

MR. THOMPSON:  Secured by $100,000 in cash and one cosigner.  And that's one point that the parties disagree on, so we'll likely return to that.

THE COURT:  Which part?

MR. THOMPSON:  The 100,000 in cash --

THE COURT:  Okay.

MR. THOMPSON:  -- secured.

No contact with any witness or victims in this case, including any of their representatives or family members, outside the presence of counsel.

THE COURT:  Any of the representatives or family members of Victim One?

MR. THOMPSON:  Of Victim One, yes, Judge. Thank you.

And then, in addition to those, several of the conditions recommended by Pretrial.  And those include:  Condition one, Pretrial Services supervision as directed; that the defendant surrender her passport and make no new applications; travel restriction to the Southern and Eastern Districts of New York; mental health evaluation and treatment as directed by Pretrial Services; that the defendant refrain from the use of the WeChat application; and that the defendant not relocate without the approval of Pretrial Services.

So those are the conditions.  And, as I previewed, there are two potential points of disagreement.  The first is the $100,000 cash to secure the bond, and the second is that the government's position is that the defendant should not be released until her home is deemed adequate for home incarceration and, second, that a GPS ankle monitor is affixed to her body.

THE COURT:  All right.  Do you want to set forth why you think those conditions are necessary?

MR. THOMPSON:  I'm happy to, Your Honor.

The government's main condition is risk of flight.  This is a defendant who has significant ties to China.  The government understands that last night -- or this morning, more specifically -- at 1:30 this morning, the defendant intended to take a flight to Hong Kong via Seoul to visit her father.  The defendant has other family members in China.

The defendant booked a flight approximately two and a half weeks ago, three weeks ago, also, to go to China.  The first flight she booked day of.  So there's a pattern here or at least one instance in which the defendant has booked international travel at the last minute.

THE COURT:  Meaning yesterday's -- or this

morning's flight was booked on the day of?

MR. THOMPSON: Forgive me, Judge. No. The first one, three weeks ago, was booked on the day of. As of right now, we can't tell when the defendant actually booked yesterday's flight. We don't have that data available to us.

THE COURT: And did she travel three weeks ago?

MR. THOMPSON: No. At the last -- she -- she did not.

THE COURT: So she booked a flight to leave on the same day, but then did not travel?

MR. THOMPSON: Yes, Judge. And, of course, when she booked that flight on the same day, she was aware that law enforcement had been investigating her, because the government had executed -- the FBI had executed a search warrant.

Now, these two flights to China were booked within weeks of each other. At least one was booked day of. And before these two trips -- intended trips to China, the defendant only had one trip to China, and that was in 2023. So there's reason to believe that the defendant is contemplating fleeing, rather than staying in the United States to face these charges which have now been brought against

her.

In addition, Your Honor, the defendant has significant financial resources, and financial tracing shows that hundreds of thousands of dollars have been moved from the defendant's accounts in the United States to accounts in China.

The complaint mentions a mediation process with Victim One.  At the conclusion of that mediation process, Victim One agreed to provide the defendant with a million dollars, and the financial tracing shows that hundreds of thousands of dollars have been moved to China.

So we're in a situation where the defendant is aware, clearly, that she is being investigated and now has been charged by law enforcement in this country.  She has significant assets and a community in China.  Over the past three weeks, when she's learned that she is under law enforcement investigation, she has clearly contemplated leaving the country.

There really is no reason to believe that she would stay and face these charges, rather than go back to China, where she has a lot of money and a community.

THE COURT:  Thank you.  All right.

Mr. Koch.

MR. KOCH:  Yes, Your Honor.

The government did indicate that my client does have assets, and so having a last-minute flight to China isn't that big of a deal.  She's not a Chinese citizen.  She only possesses a U.S. Passport, which is now in the possession of the government.

As far as this two to three weeks ago, she's had a private attorney for several weeks now. There have been communications back and forth.  If they were concerned and wanted to conduct an arrest, all they would have had to do was reach out to Mr. Chabrowe yesterday.  There was no discussion that she could go anywhere or stay or do anything.

And the fact that she could have done this two or three weeks ago or done it at the time when the FBI knocked on her door and conducted the searches and things like that, if she was going to run somewhere, that's where she was going to run. If there was --

THE COURT:  Wait.  Sorry.  Are you suggesting that the government hadn't been in touch with Mr. Chabrowe or a colleague yesterday?

MR. KOCH:  About the arrest, no.  If they

had said that she couldn't or shouldn't leave, he would have told her that she can't leave.

She's going to visit her sick father. The government said that. She is transferring assets to China. Her father is sick. There's no infrastructure for any of that kind of thing, so that's where -- that's where the money's going. She had a return ticket to come back. It's not a -- it wasn't a one-way ticket.

THE COURT: When was the return date?

MR. KOCH: When was --

THE DEFENDANT: June 30th. Your Honor, June 30th is the return day.

THE COURT REPORTER: I'm sorry?

THE DEFENDANT: Yeah, June 30 is the return day because my father is sick, and I have been waiting to see him. I wanted to see him, at least. If he pass away, I would feel so regret of my life. So I wanted to see him and come back quickly.

I have been waiting to go to the -- the interview, the meeting with Mr. Thompson, and it has not had the date, so I thought that I could at least see my father. He has been ill for quite a few years now, and I don't want to miss the last opportunity to see him if he pass away.

And so that's why I made a trip to see him, and nobody told me that I cannot travel.  So if somebody say I cannot travel, I would not -- I would not do it.  So the only purpose is to see my father -- to see my dad.

THE COURT:  Thank you.

THE DEFENDANT:  Thank you.

MR. KOCH:  So that's the issue, is that she can book a last-minute trip to China.  I don't want to assume, but I'm assuming that's what led to a weekend arrest.  Otherwise, like I said, she's had Mr. Chabrowe as the attorney.  There's been excellent communication back and forth with the government.  I don't have privy to all those emails or texts or what was said, but I believe the government would agree.  I don't want to put words in their mouth.

If Mr. Chabrowe had been told that she shouldn't travel, she wouldn't have traveled.  You don't hire someone like him to handle a case like this and then run.  There's no point.  And given those two, three weeks even prior, after the -- after the search, wouldn't that be the most opportune time to run?  Why a day before an arrest?  That -- that -- that's my main concern.

And, furthermore, like I said, she does not have Chinese citizenship.

THE COURT:  Sorry, what -- what's your main concern?  You said, "That's my main concern."

MR. KOCH:  Oh.  That's my main concern, is that she doesn't have -- she doesn't have Chinese citizenship or anything.  She's going to visit her father.  Booking a last-minute flight isn't that big of a deal.  It wasn't a one-way flight.  There's a flight that's returning.  She's not trying to run.  You don't hire an attorney; you don't book round-trip tickets.

Now, as far as the money being moved to China, she's got family there.  She's got money.  We're talking about settlement agreements that have occurred.  Culturally, that's something that does happen.  I understand the ties there.

But she has no legal ties there.  She can't stay there.  She can't, like, just go to China and stay.  She's not a citizen, so it's not -- it's not an extradition issue or anything like that.

So my main concern, as far as, like, having her -- either having to pay that $100,000 in cash -- which, if we had to do that versus some sort of incarceration regarding a flight risk, fine, we

would make that trade.  But she's never been arrested.  She's in poor health, which Pretrial has confirmed.  She's this big.  I'm not saying that someone, you know, this big cannot cause issues, but she's not someone who can just upend her life and go to somewhere just because the understanding is that, "Oh, she has a Chinese name, she's got family in China, so therefore she can go to China."  It just means she can visit on a tourist visa.

Oh, sorry.

THE COURT:  You can be seated.  I'll be -- I'll give you an opportunity.

MR. KOCH:  So --

THE COURT:  I mean, do you want to address -- in the complaint, it sets forth, in connection with count one, the ways in which your client is alleged to have taken efforts to impede the government's investigation, including by trying to -- you know, by refusing to answer the door for 30 minutes or 20 minutes and then, apparently, trying to conceal a significant amount of electronic devices, suggesting that she is trying to be deceptive.

MR. KOCH:  So, as far as that is concerned, I mean, people react in all sorts of ways when the

federal government starts banging at the doors.  And I'm not going to say that's an acceptable form of behavior at all.  But that doesn't mean someone's trying to run.  She would have ran after that, after they did all those searches and things like that, and said, "Oh, well, there's no win in this.  I'll go now."  And she didn't.  She didn't leave.

She only waited when there was a chance with her father, after she had -- her attorney, Mr. Chabrowe, had significant communications back and forth with the government and no -- nothing that said that she couldn't leave.  There was nothing that said she couldn't leave.

THE COURT:  Okay.  Anything further.

MR. KOCH:  As far as -- I am -- so we are in agreement in most of the Pretrial conditions.

One of the issues that my understanding is, is that the GPS monitor can't be installed today.

THE COURT:  Correct.

MR. KOCH:  Which we have no issue with having a GPS monitor, but the concern to have her incarcerated until, at minimum, Monday to have something checked out, just because it's a weekend and it's -- you know, it's not her fault that this was Friday.

We'd most likely be in agreement and, if we so chose, Judge, and those conditions were imposed, she'd be going home. Now she can't go home.

Again, medical issues related to -- and, oh, we were going to bring up one sort of issue related to my client's medication, which is in her bag. But whether -- if she is ordered incarcerated today, the issues with getting that to the MCC or the MDC. You know, they're psychotropic in nature and stuff like that.

Given that -- that burden on her mental health and on her physical health, given other medical conditions that the Pretrial has confirmed, the concern is --

THE COURT: Can you --

MR. KOCH: -- even if we're all in agreement and everything, if she spends the next two or three days in -- at minimum, mind you, Your Honor -- at minimum, in a federal incarceration, when she could come home, maintain her attorney, show back up on Monday, get -- get any kind of monitoring installed, and then go about her day, simply because it's a weekend, would be severely problematic to her mental health going forward and her ability to continue to fight the

case.

THE COURT:  And just so I'm clear, when you refer to her medical conditions, you're referring to mental health conditions or physical?

MR. KOCH:  Mental and physical, Your Honor, yes.

THE COURT:  And physical.  I don't think I'm aware of the physical conditions, but --

UNKNOWN SPEAKER:  (Inaudible).

THE COURT:  Sure.

UNKNOWN SPEAKER:  (Inaudible).

THE COURT:  Okay.  All right.  Thank you.

MR. KOCH:  Thank you, Your Honor.

THE COURT:  All right.

Mr. Thompson.

MR. THOMPSON:  Your Honor, a few points. First, defense counsel represented that the Pretrial Report says she's in poor health.  That's not what the Pretrial Report says at all.  It says that her health conditions are actually being -- are, quote, "currently under control."  So I just wanted to correct that.

Your Honor asked defense counsel a question about the defendant's obstruction of law enforcement efforts and investigation.  Specifically, the

conduct that's charged in count one, her refusal to open the door so that law enforcement agents could execute the search warrant, and then her concealment and hiding of various devices, which, after being searched pursuant to lawfully authorized search warrants, contained a lot of inculpatory evidence -- that conduct makes clear that this defendant does not intend to comply with law enforcement.  That has already been indicated and expressed by the defendant's obstruction.

Defense counsel said if the defendant was going to flee, she would have done so after the execution of the search warrant.  Well, she bought a ticket to go to China.  She ended up not doing so, but she did indicate that she was going to travel in close proximity to a law enforcement operation. That clearly is indicia or mens rea that she intended to flee, particularly when you add on top of that that she hadn't bought a ticket to go to China for several years before that.

Now, that first ticket three weeks ago is actually a completely different framework from where we are today.  Now, there's not only been a search warrant where the defendant obstructed the law enforcement operation, but there's no ambiguity that

she has been charged now with serious federal crimes.

She has every incentive to flee, Your Honor, full stop.  And then add on top of that the fact that the Pretrial Report says that she has no contacts in the United States except for her ex-husband, with whom she has virtually no contact, and one other individual, her romantic partner. There are only two people that this defendant says that she knows in the United States, and one of them she doesn't even speak to.

The Pretrial Report says her family, who she speaks to at least once a week, despite being in China, are all in China.  Add on top of that that she has significant resources, much more money than she has in U.S. banks, in China.  And then consider that she is sitting in federal court right now facing charges.

It is clear that this defendant poses a risk of flight, and the government is not even seeking to detain this defendant until she wears an ankle monitor.  Your Honor handles all sorts of cases.  There are multiple ways to flee charges. Sure, an individual can roll the die and try to book a flight, but many defendants can rent a car, drive

to Canada, drive to Mexico.  There are many ways to evade facing charges.

It's also possible to hide within New York City itself.  It's very difficult to find people. The conditions of the Bail Reform Act, I think, map onto the government's request, and it's wholly reasonable to say that this defendant should not be released until at least her home is judged adequate by Pretrial for home incarceration and that the government can know where this defendant is by virtue of an ankle monitor.

THE COURT:  Can I ask Pretrial just a couple of questions?  First, can you confirm that if the defendant is detained today, that you would be able to conduct the home visit on Monday and install a GPS device such that, assuming the home is adequate, she can be released on Monday?

PRETRIAL SERVICES CLERK:  So I cannot confirm that we would be able to conduct a home visit on Monday.  I also (inaudible).

THE COURT:  Okay.  My second question is to ask your opinion on home incarceration versus home detention.  It's my understanding, though I may be mistaken, that home incarceration would not permit her to leave for --

PRETRIAL SERVICES CLERK:  Correct.

THE COURT:  -- for anything.

PRETRIAL SERVICES CLERK:  Yes.

THE COURT:  Yeah.  Do you have a view on whether home incarceration is necessary?

PRETRIAL SERVICES CLERK:  I'm -- in my opinion, I do think home detention is more fitting because it is clear that she does (inaudible).

THE COURT:  Okay.  Thank you.

So I just want to -- it appears that she does receive mental health treatment.

Can you even go to your lawyer's office on home incarceration, or does your lawyer have to come to you?

PRETRIAL SERVICES CLERK:  You can let the office know and -- (inaudible).

THE COURT:  To counsel meetings.

I mean, home detention is still quite restrictive.  It's not sort of go out as you see fit; it's go out for preapproved appointments, which would allow for medical visits and things like that.

So can you just explain to me why you think -- assuming we've got a bracelet on her, we have -- we know when she's leaving so we can monitor if she's left, you know, before or comes back late

or anything like that, and it's all preapproved, why do you feel like you still need home incarceration?

MR. THOMPSON: Yes, Judge. Before receiving the Pretrial Report and hearing comments from Your Honor and the Pretrial Services officer, the government wasn't aware of what appears to be the extent of appointments and other medical appointments this defendant may attend.

The government's position is that there's no indication that this defendant has any lawful work, so there was no reason, in the government's mind, when proposing these conditions that the defendant should have been allowed to leave her residence, which is to say One World Initiative does not appear to be any sort of legitimate employment; therefore, there would be no reason for anything less than home incarceration.

With this additional information and the it was kind of glossed that there are still significant restrictions on the defendant's liberty, and it seems like there might be multiple instances a week in which appointments are necessary --

THE COURT: Yeah, everything has to run through Pretrial. It wouldn't be sort of a free-for-all, doors wide open. It would be much

like home incarceration, except the exceptions to the home detention are -- you know, being locked in your home, so to speak, are slightly more generous, which is to say things like a medical appointment would be acceptable.

MR. THOMPSON:  I think that would be -- I think that's acceptable to the government.  And, again, to answer Your Honor's question of why that wasn't the first proposal, I just didn't understand that there was the necessity, at least, for those reasons.  But I don't oppose that.

THE COURT:  Okay.  Can I ask you one other question, which maybe you or your agent would know?  Do -- do you, in fact, know whether or not the ticket that was -- that Ms. Luo was traveling on this morning did, in fact, have a return flight?

MR. THOMPSON:  Let me ask Special Agent.

Your Honor, we don't have the records from yesterday's travel yet.  We anticipate having them at some point.  We're happy to let the Court know, but we can't answer that right now.

THE COURT:  Okay.  All right.

Anything further?

MR. KOCH:  Just one point, Your Honor.  I'll be real quick.  The entire argument that she's

here, she's facing a complaint, she's facing -- she's been arrested, she's all this -- count one -- the allegations in count one happened weeks ago. She's been walking around free.

She's only here now because she bought a ticket to China.  Otherwise, she would have had whatever meetings or agreements or proffers or discussions that could have happened prior to an arrest.  So what's killing me here is that the argument that all this is coming up is simply -- I mean, it's all piled on, and I get it.  But she bought a ticket to China.

If she hadn't bought a ticket to China, were they planning to do the arrest yesterday or today?  Were they planning to tell Mr. Chabrowe that they were going to do the arrest?  Could it have been a voluntary surrender?  If it was going to be a voluntary surrender, why was there -- in her own words, they're waiting for the meeting.  They're waiting for the meeting.

So that's it.  It's just like the government created this situation.  I mean, I'm not saying what my client did or didn't do to lead up to it -- but the government creates its arrest and then putting in front of you and saying they're trying --

"Look, she's trying to run.  Here's all these other things that she did," when, really, she's just going to try to sick -- see her sick father, and then she's coming back and waiting to do whatever interviews or proffers or agreements that get done prior to walking in right here.

THE COURT:  Okay.

MR. KOCH:  That's it, Your Honor.  Thank you.

THE COURT:  I'm not sure if I totally agree that the government created this situation.

MR. KOCH:  Well, I mean, when they're saying -- look, they didn't arrest her after count one.

THE COURT:  Excuse me?

MR. KOCH:  The government and you read the count one, that she did all this stuff to -- as part of the argument to bolster that she could run, because she tried to conceal.  Right?  But that happened weeks ago, and she's still walking around.

She buys a ticket.  She doesn't go anywhere.  No arrest.  She buys another ticket, but now a round-trip ticket.  She's waiting to have her meetings with the government about this case prior to an arrest.  She buys a ticket to China.  Now we

have the arrest, and now we have the reason for detainment, where, if there had been no ticket to China...

Now, I can understand the argument is that she's running. I get that. I get that argument. But why this ticket? Why this weekend? Why Friday? And why not weeks ago, when she bought the ticket and didn't go anywhere, after count one's behavior took place?

That's what I'm trying to get at, is it's kind of like the chicken or the egg, in the sense that we're here because of the arrest. But if she had gone, come back, they'd be still in the same position where they're doing all the agreements or the proffers or anything pre-trial before we end up with the arrest or an arrest or indictment, you know, when everything kind of happens, everyone's in agreement, and then we present.

That's the issue here, is that she bought this ticket, and now she's here. And now their argument is literally, "Look at all the other things that happened."

So that's what I want to know, is what changed from the first ticket she bought to China, versus the second ticket she bought to China?

THE COURT:  She went to the airport. That's what changed.  I think that's what changed.

MR. KOCH:  So if she had gone to -- is their -- is the argument, if she had gone to the airport the first time, they would have arrested then?

THE COURT:  Maybe.  I don't know.

MR. KOCH:  But no one said that she couldn't go anywhere.  They're in communication with a defense counsel.  They're setting up meetings, meetings that are going forward, taking place.  But because her father is sick and ill and dying, she goes -- decides to take the trip.  All of a sudden, now she's trying to run.

I don't know what to say beyond that, Your Honor.  Thank you.

THE COURT:  Thank you.

MR. THOMPSON:  Your Honor, if I could just -- this is really for the sake of the record, but I just have to clarify something.  There have been multiple representations or statements, both from the defendant and defense counsel, about waiting for a meeting or coming into a proffer with myself or other AUSAs on this matter, and there are no such offers outstanding with respect to meetings

or proffers.

THE COURT:  Thank you.  All right.

THE DEFENDANT:  Can I say something?

THE COURT:  Why don't you speak through your lawyer?

(Discussion off the record.)

MR. KOCH:  Okay.  Can I just ask the government, were there communications with Mr. Chabrowe trying to schedule some sort of meeting or event?  Because my client is saying that the original ticket, she canceled, because her understanding from Mr. Chabrowe -- and I apologize that he's not here -- but my understanding from him, too, was that there were communications.  Again, no proffer scheduled or anything like that, but that that would be coming up at some point.  So I'd like to just know if those communications were going on.

Was there a discussion at some point, "We will meet," or "We'll talk," or "We'll do these things"?  If that's what's going on, and then all of a sudden, now we have an arrest.

THE COURT:  Right.  I don't know that clarifying this particular point is going to be relevant.  All right.  You know, I don't know that that's really going to -- going to tip the

calculation.  So unless anyone has any further arguments.

MR. THOMPSON:  No, Judge, I just -- my argument is more directed to specifically why the $100,000 should be put up in addition and not just the $500,000 bond.  I'm happy to address any questions Your Honor has with respect to why the government's view is that the defendant should put that money up in cash.

THE COURT:  I assume it's to prevent flight.

MR. THOMPSON:  Exactly, Your Honor.

THE COURT:  Okay.  All right.  Thank you, everybody.

All right.  Thank you for all of your arguments.  I appreciate them.  Thank you to Pretrial for the thorough report.  Obviously, they're expert here, so I take their advice quite seriously.

I agree with all of the people in the room that Ms. Luo does not need to be detained pending trial in this case.  But in light of the circumstances leading up to her arrest, both the efforts to conceal significant evidence in the case and the flight, I am going to require her to be

detained until Monday.  She will be brought in on Monday.  She will have a bracelet fitted on Monday.

Ms. Harris, I'm going to make a request that we try to do the home visit on Monday, if possible, but I am going to allow the defendant to be released on Monday even if that home visit cannot happen.  But the bracelet is critical.

On the agreement of the parties, the bond will be set at $500,000.  I am also going to impose a cash component, given the information that's been provided about the significant assets that your client has.  If for some reason, that is an impossibility, you can make an application to the Court.

Yes, sir.

MR. KOCH:  Your Honor, the government and us were in agreement about two weeks being able to -- so if she's released, then she has about two weeks to pay the --

THE COURT:  Secure?

MR. KOCH:  Yeah.  Pay -- secure the bond.

THE COURT:  That's fine.

MR. KOCH:  Thank you, Your Honor.

THE COURT:  All right.  So the bond will be for $500,000.  It needs one financially responsible

cosigner and be secured by $100,000 cash.  That needs to happen by January -- excuse me -- June 27th.

I'm going to impose home detention, not home incarceration.  Ms. Luo, your Pretrial officer will explain to you what that means.  It does mean, essentially, that you will be detained to your home, assuming that it is deemed adequate.  You will be allowed to leave, but only with prior approval from your Pretrial officer.  So we'll have a GPS device on your ankle so we'll know whether or not you've left or not.  And you aren't permitted to freely come and go as you choose.

You'll be permitted to visit your lawyer. You'll be permitted to go to preapproved medical appointments, but everything needs to be preapproved.  So, if you just leave your apartment, that will be a violation of the conditions of your release.

Otherwise, your supervision will be as directed by your Pretrial Services officer.  I believe your passport has been seized, but if you have any other passports, they need to be surrendered, and you're prohibited from making any new travel applications.  Your travel is otherwise

restricted to the Southern and Eastern Districts of New York.

And we'll make sure that we have a no-go zone by the airports, Ms. Harris?

PRETRIAL SERVICES CLERK:  Yes.

THE COURT:  Okay.  So the GPS device will send off an alarm if you approach the airports.

You're required to undergo -- to receive a mental health evaluation and treatment as directed by your Pretrial Services officer.  If you are already receiving treatment, then you can just provide verification of that from your private provider.

You are prohibited from the use of the WeChat application.  You are prohibited from having any contact, direct or indirect, with any witnesses or victims of the alleged offense, including Victim One, as identified in the complaint, and any family members or representatives of Victim One.

You are not permitted to change your home, your residence, without preapproval from your Pretrial Services officer.

And as we discussed, the security on the bond and the cosigner needs to be done by June 27th, which is a Friday.  So that's 13 days from today.

Let me warn you that if you fail to appear in court or if you violate any of the conditions of your release, a warrant will be issued for your arrest, and you may be charged with a separate crime of bail jumping. You'll also forfeit your cash bond, and you may be required to pay the full amount, or a cosigner will. Also, if you commit an offense while you are released on bail, you may be subject to a more serious sentence than you would have received if you committed the same offense at any other time.

All right. Mr. Koch, when would you like me to set the preliminary hearing?

MR. KOCH: Whatever date works.

THE COURT: Waive it to the 30th day?

MR. KOCH: That's fine.

THE COURT: This is a little bit of a placeholder.

MR. KOCH: That -- understood. That's fine.

THE COURT: Okay.

MR. KOCH: Before --

THE COURT: Let me just set the date. That's going to be June 30th.

MR. KOCH: June 30th. Okay.

And then so June 27th for the -- the bond and -- sorry, what I'm saying -- and one thing, that if she's going to be detained this weekend, I just want to make sure that her prescriptions --

THE COURT:  I'll do a medical order that will travel with her.

MR. KOCH:  Thank you.

THE COURT:  If you have -- do you guys have her medication?

MR. THOMPSON:  Yes, Judge.

THE COURT:  Can you get it to counsel so we can just make sure we have exactly what is needed?

MR. THOMPSON:  Your Honor, my understanding is, from the Special Agents, that typically there's a handoff to the marshals of the prescription, but I will make sure we follow typical protocols.

THE COURT:  Let me -- let me ask the marshals real quick.

MR. THOMPSON:  I'm not really sure.

THE COURT:  Can we just -- this person should only be detained until Monday, so it's just, like, a 36-hour stint.  Can we just hand over her medication so that she can take her daily prescribed medication?

THE COURT MARSHAL:  MDC may not accept it.

We plan on taking her to go get a fit after this.

THE COURT:  Okay.

THE COURT MARSHAL:  If they prescribe anything there, that we can give to the jail.  But they will not accept any outside --

THE COURT:  So you're taking her to a medical provider now?

THE COURT MARSHAL:  Yes.

THE COURT:  Okay.  So she's going to see a doctor now.  And so -- again, we're talking 36 hours, Counsel.  Tell me if you think 36 hours without whatever she's got -- I don't know if it's sort of the type of medication she can go 36 hours without.

MR. KOCH:  We're okay, Your Honor.

THE COURT:  You're okay?

MR. KOCH:  Yes, Your Honor.

THE COURT:  Okay.  So I won't do a medical order.

All right.  Anything further?

MR. THOMPSON:  No, Your Honor.  Thank you.

THE COURT:  Anything further here?

MR. KOCH:  Thank you, Your Honor.

THE COURT:  All right.  Thank you, everybody.

Two just points.  Number one, thank you, everybody, for mobilizing on a Saturday.  Number two, I've been advised that there are 25,000 protesters on their way to the courthouse.  And so people should leave as expeditiously as possible, and be safe.

C E R T I F I C A T E

     I, Marissa Lewandowski, certify that the
foregoing transcript of proceedings in the case of
UNITED STATES OF AMERICA  v. Changli Luo,
Docket #1:25-cr-00412-MMG, was
prepared using digital transcription software and is
a true and accurate record of the proceedings.


Signature  *Marissa Lewandowski*
_____

                Marissa Lewandowski


Date:       December 3, 2025