PCFDLuoC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.                     25 Cr. 00412 (MG)

CHANGLI LUO A/K/A SOPHIA LUO,

                            Conference
         Defendant.

------------------------------x

                           New York, N.Y.
                           December 15, 2025
                           11:30 a.m.

Before:

                HON. MARGARET GARNETT,

                           U.S. District Judge

                   APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BRANDON THOMPSON
    Assistant United States Attorney

ARTHUR AIDALA
ALEXANDRA JO DEBENEDICTIS
    Attorneys for Defendant

ALSO PRESENT:

    Francesca Piperato

(Case called; appearances noted)

THE COURT: Good morning, everyone. I apologize. I'm a little bit under the weather. You'll just have to bear with me, my voice. You can be seated.

So I asked you all to come in because I had a number of questions, related primarily for pretrial services about how in practice it works, the current conditions of Ms. Luo's confinement. I'll just deal with one issue at the outset. I certainly take the government's point that compliance with existing conditions does not amount to changed circumstances, and the mere fact that a defendant is in compliance doesn't go very far with me. That's where -- the minimum that we would expect.

However, I am interpreting Mr. Aidala's letter to really be proposing, as changed circumstances, the argued effect on Ms. Luo's mental and physical health, that she's not able to get outside exercise, as the changed circumstances and the compliance primarily as an argument for why those changed circumstances ought to be given some effect by the Court. So, I just want to have a better understanding, Ms. Piprato, from you --

First, is Ms. Luo working at this time, Mr. Aidala?

MR. AIDALA: She is, your Honor, but, honestly, that's all done from home. If I may, what kind of triggered this was her kind of mental health providers reaching out under her

current conditions. So, one of her doctors, one of her therapists wanted to just like take a walk in the park with her while they conducted the therapy, and that's something that she's not allowed to do. And they also made clear that her being able to just take a walk is something that is very important.

If you look at the pretrial services report, the original one, it says that she suffers from depression and has been treated for that. And, obviously, the fresh air and the sun has a lot to do with that -- has a lot to do with treating that. She had the depression before the case began.

THE COURT: Okay. But just specifically on the work, is it fully remote?

MR. AIDALA: Yes, your Honor.

THE COURT: All right. So, Ms. Piperato, when Ms. Luo leaves her apartment for therapy or for attorney visits or to come to court today, how do you track that? Do you approve those visits in advance? How does that work in conjunction with the GPS monitoring?

PROBATION OFFICER: So, her condition is home detention, and that only permits me to authorize her to leave for court appearances, attorney visits, medical, employment, and basic necessities, given she lives alone, like, laundry, groceries. Other than that, any other social activities, like walking, the gym, things of that nature, we can't approve.

She's pretty much given a weekly schedule. I've discussed with her, her therapist as well, so she's on a GPS data monitor. It allows us to track with GPS data where she is going. So there are zones put in place for her therapy, for her other medical appointments, her physical therapy, mental health therapy, laundry, groceries, and church. And she provides receipts for all of that.

So, for church, she provides the weekly log every Sunday. I usually receive it Sunday, Monday. Same thing for her groceries. She provides me a receipt. Laundry is like within the building facility, so that's fine. There's a zone in place. All her other documents she provides me documentation for. Then I communicate with one of her therapists monthly I would say to be sure that she's attending her appointments.

The therapist did reach out to me, inquiring about walking around, and we can't permit that. In addition, it would be rather burdensome to figure out if she was in therapy during that timeframe and meeting with him. So that is why the zone is in place. It's one location and back. So all of her appointments are one location, point A to point B.

THE COURT: Okay. So would it be -- so in pretrial services' view, essential activities as defined in the home detention can be -- does not include physical exercise.

PROBATION OFFICER: No. No physical exercise, social

gatherings, it's basic necessities and court employment, education, like therapy, mental health, substance use.

THE COURT:  Okay.  And if the Court were to approve some set number of days a week that she's permitted to go outside for a walk in the prescribed area, how would you monitor that?

PROBATION OFFICER:  So, well, if I may, from a pretrial standpoint, we are agreeing with defense counsel that curfew with GPS would be most appropriate.  From our perspective, it's one of the least restrictive conditions, and, in the initial bail report, we recommended stand alone, which wouldn't even have a schedule, it would just have a bracelet, just to ensure she remains in the Southern and Eastern District.

If the Court were to impose a set schedule, I have seen it before.  Let's say three times a week she is permitted to take a week, whatever the hour timeframe.  Looking at the GPS points, there's not necessarily anything I'm looking for, because she's permitted throughout that time, but she would just have a set schedule.

We could impose a curfew where it's maybe not as lengthy as a normal curfew hours, which would still give her a lot of time to attend to any other necessities she may have or things she wanted to do, like, I'd say, 7:00 to 7:00, something a little bit more restrictive.

THE COURT: All right. That's very helpful.

Mr. Thompson, let me hear from you.

MR. THOMPSON: Thank you, your Honor.

The government's papers, as the Court referenced, did not quite understand the defendant's motion to be based on concerns for the defense's mental and physical health, which, of course, are important. So I'm responding in realtime for those.

It is difficult to assess what is appropriate or necessary for this defendant to make sure her mental and physical health are not impaired in a way they should not be in terms of being a defendant in a criminal prosecution. I believe Ms. Piperato mentioned the pretrial services report that was prepared in June recommended stand alone, and of course pretrial considers certain factors and does not consider certain factors that the government does and that the Court can when making recommendation as to what conditions are appropriate.

There are several factors -- those were primarily outlined in the government's papers, which we know the Court has read -- which make clear that any conditions less than what are currently in place are not adequate to make sure this defendant does not flee. There are significant reasons why she would and significant assets, in a country for which we have no ability to extradite her. I won't recite those, of course,

unless the Court would like me to, because I'm sure your Honor has read the papers carefully.

If there were a way in which -- and I think Ms. Piperato said it might be possible to have certain days or times in which the defendant is able to take a walk, if that is possible while still remaining -- keeping a GPS monitor in place and perhaps making sure there are exclusion zones, perhaps that would be sufficient. But I think under no circumstances should there be a listening of a GPS monitor.

THE COURT: Yes. I agree with you, Mr. Thompson. I remain very concerned about the defendant's risk of flight.

So, Ms. Piperato, I want to make sure I'm not imposing an undue burden on pretrial, truly. Would it possible for you to each week set a one-hour period a day where Ms. Luo is permitted to be outside of her apartment within, you know, some kind of exclusion zone as Mr. Thompson was suggesting? Is that possible?

PROBATION OFFICER: Yes, that's possible.

THE COURT: Could you add that to her approved schedule?

PROBATION OFFICER: Yes. I would need, obviously, a Court order indicating we are approved to give her an hour or so timeframe out. There isn't anything necessarily we would be looking for during that timeframe, so what she chooses within that hour is up to her, unless otherwise directed.

But I would just say, from the pretrial standpoint, from the curfew, we're not asking to remove any form of monitoring. There is no location monitoring without an ankle bracelet. So we'd still want her, obviously, to have the GPS monitor. It would just be a window that would give her that permission, and, from a pretrial standpoint, if the government's okay to let her out for an hour, then what are a couple extra hours, so long as a zone is put in place.

THE COURT: Yes. My concern with the additional hours is I want to make sure -- to me, 7:00 to 7:00 is too broad a time, because you only need two hours to get to JFK and board an international flight. So I'm certainly very open to the idea that -- I mean, even if she was at the MDC, she'd have some opportunity for outdoor recreation. So, I am sympathetic to the idea, given her mental health history, that there should be some time during the day she be permitted to go outside and walk and get fresh air and sunshine. I just want to limit those -- I'm just not comfortable, given the risk of flight, that we have essentially a 12-hour period where she's free to do whatever she pleases.

PROBATION OFFICER: Yes. I do want to let the parties know that there are exclusion zones already set around up airports, given she's on a GPS monitor, and, with a GPS monitor, it does, if there's a tamper, notify immediately versus other equipment.

THE COURT: Okay. That's helpful.

Mr. Aidala.

MR. AIDALA: Your Honor, I just want to -- my understanding is -- I was not the original attorney on this case, but my understanding was, before she was arrested, there was awareness that there was an investigation going on. Before she even purchased a ticket to go to China to visit her ailing father, her lawyer at the time called DOJ and said, she's going to China to visit her dad; is that okay? And she was told by her attorney it was okay.

She bought a round trip ticket. I know her father was there, and I know her father's ill. So I think it's getting painted like, oh, she knew she was under investigation and she was leaving. That is not my understanding. Again, your Honor, I wasn't that attorney, so I can't tell you I was the one who made the call, but my understanding is she asked permission, even though she wasn't charged with a crime. And they knew there was an investigation. And, again, she bought a round trip ticket.

So, I just want to put the Court's mind at ease to some degree about her risk of flight, and, also, your Honor, having a lot of experience with these GPS monitoring systems, they're very good, you know, the advancement of the last decade. So if she goes into any of these exclusion zones, there's like lights and sirens that go off all within the

PCFDLuoC

pretrial services, and maybe within the Marshals Office.

You know, your Honor, I would ask, an hour, when you look at an apartment building, by the time you go downstairs and go somewhere and get back in, you know, it's not an abundance of time. I mean, I think even in the MDC you get more than an hour.

THE COURT: Well, it's supposed to be restrictive. Mr. Aidala, she is on home detention. I agree it's not a lot of time, but I'm trying to find a compromise that will allow her some fresh air and sunshine while, also -- I share the government's concern about risk of flight, recognizing that systems have improved greatly. They're not foolproof, and our pretrial services officers are asked to do more than they should be. So, I recognize that there are potential roles in that system --

MR. AIDALA: I would ask the Court, if you are going to consider that timeframe, maybe we can make it two hours. I don't believe, if you look at the pretrial services report, the amount of money she has, who she is, and where she's from, there's not a big degree of sophisticated here, that this is a client who's going to figure out a way to get a fake passport, fake tickets, get to the airport, and fly to China. That's asking a lot from someone who has a job at home working for a not-for-profit.

So, I understand the Court's concern, but I'm sure the

PCFDLuoC

Court is looking at the person as a whole, the totality of the circumstances, and also the seniority of this pretrial services officer. I don't think she would be putting her own career at risk asking for this unless she felt confident about it.

THE COURT: Okay. Ms. Piperato.

PROBATION OFFICER: Just to provide some clarity, I have her schedule in front of me. She's essentially out five days a week, so she has set schedules which are quite a substantial period of time. One from 2:00 to 6:30 for her physical therapy. She has her grocery schedule, a similar timeframe, depending on which grocery store she goes to. So she does have pretty much a set weekly schedule where she is out a substantial period of time and has been in full compliance. I don't think she's missed one document, sending it to me.

So I just wanted to give you that information, so you know she is out quite often.

THE COURT: That's quite helpful, Ms. Piperato. Do you have a schedule, her weekly schedule?

PROBATION OFFICER: I have her phone. But I have written here my notes essentially. She attends church weekly. She provides a religious service log. Grocery weekly, usually Wholefoods. Laundry downstairs. Medical appointments, she provided those documentations. Therapy, I have where she goes to therapy and the medication.

THE COURT: So I think you said a minute ago, Ms. Piperato, that essentially every day she's outside walking to groceries, appointments, and the like for several hours a day?

PROBATION OFFICER: Yes. So if I use that example of, like, the physical therapy, it's 2:00 to 6:30, so it gives her enough travel time to get there and get back. If she -- I say walks -- usually we recommend people to take the most efficient route, so, yes, to ensure that we're restricting their movement in the community, but given where her appointments are, she is out for some time.

THE COURT: Okay. That's helpful. Thank you.

Mr. Thompson, anything you'd like to say?

MR. THOMPSON: Your Honor, I didn't have enough information until Ms. Piperato shared. I think that's helpful, but it does seem that the defendant is able to be outside.

And just to respond to Mr. Aidala's comments about ability to flee, the crux of this case is about the use of technology, AI software and other applications, to make fake images and documents. So I just wanted to put that in the record.

And, of course, as your Honor knows, there are ways to flee that don't involve planes. Cars are often used, and it's difficult to find someone before they access or rent a car in non-exclusion zones. And if your Honor is considering amending

the condition, so defendant can take walks, I would propose, rather than having a blank geographic area in which she can walk, I don't know if she lives near a park and perhaps permission could be that the defendant can be in this park for an hour a day, so it's easier to monitor in this period of time when she has more freedom, she needs to be walking in this location.

THE COURT:  Is that possible, Ms. Piperato?

PROBATION OFFICER:  It is possible to set up a zone in that area.  I would say it would be a little tricky depending on how we work through that, but I think that's possible.

THE COURT:  Mr. Aidala, where does the defendant live?

PROBATION OFFICER:  We just conducted a home visit -- 41 Park Avenue.

MR. AIDALA:  I'm just trying to find out the cross streets.  Between 36 and 37 on Park, Judge.  I guess 10 blocks away from Madison Square Park, on 26th and Madison, or Bryant Park is on 42nd and Park.

THE COURT:  All right.  Here's what I'm going to do. I'm going to leave in place the condition of home detention. However, given that one of the exceptions for home detention is activities approved by the Court, I'm going to authorize pretrial services in the weekly schedule, if there is a day in the week, based on the schedule submitted in advance, that Ms. Luo does not need to be outside of her apartment for some

other approved activity, that I will permit pretrial services to authorize an hour of outside recreation time on a day where -- if there is a day where Ms. Luo is not otherwise allowed to leave her apartment for authorized activities, pretrial services can add one hour of recreational time.

That exclusion zone that prevents Ms. Luo from contacting the victim or family members is to remain in place.

Go ahead, Ms. Piperato.

PROBATION OFFICER:  So, we only have exclusion zones for the airport.  I don't have the information as to who the victims are, like that address or location.  I don't have that.

THE COURT:  Okay.  I know Mr. Thompson will have the conditions of Ms. Luo's pretrial release, that she not have any contact with the victim or his family matters.

Is that correct?

MR. THOMPSON:  That is, your Honor.  And just to put on the record, that information that pretrial doesn't have is coming from victim's counsel to the government.  We just don't have it yet.  We will share it with pretrial.

THE COURT:  All right.  The condition remains in place.  I misunderstood that that was part of the GPS monitoring.  But we'll just leave things as they are for now.

MR. THOMPSON:  All right.

PROBATION OFFICER:  Apologies.  So, when we do get that information, can that possibly be added so that we can

ensure we've put zones in place? Normally, when there's a no-contact condition, we're not putting zones unless it's specified. So as soon as we get that information, we can add it when we know the address we're looking for.

MR. THOMPSON: Judge, perhaps it makes sense, when the government obtains the address of the victim, the victim's family, that the conditions be amended to specifically add those exclusion zones.

THE COURT: Yes. Let's take it one step at a time, because I think the difficulty is, once we have those addresses, we may find out that, given the location of Ms. Luo's other appointments, that it's not feasible. So we'll just take it one step at a time.

PROBATION OFFICER: And, apologies, your Honor, just to clarify, so it's one hour recreation on a day that she is not already out for any other appointments.

THE COURT: Yes, that is correct.

Okay. Now, of course, Mr. Aidala, that's without prejudice to you renewing the application if there's new information you'd like to submit, but I think that's, for now, an appropriate compromise between the existing conditions and ensuring that Ms. Luo has some time and some fresh air and sunshine each day.

Mr. Thompson, anything from the government?

MR. THOMPSON: No, your Honor. Thank you.

PCFDLuoC

THE COURT: Mr. Aidala?

MR. AIDALA: No, Judge. Thank you.

THE COURT: All right. We are adjourned. Thank you.